Filed 8/5/22

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C090365 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE01379) |
| v. | |
| JERRY VANG, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Steve White, Judge. Reversed in part with directions and affirmed in part.

David L. Polsky, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Jessica C. Leal, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts I, III & IV.

After a jury trial, defendant Jerry Vang was convicted of numerous crimes against two different victims, including kidnapping (Pen. Code, § 207, subd. (a));[1] first degree felony murder with a special-circumstance finding (§§ 187, subd. (a), 190.2, subd. (a)(17)); infliction of corporal injury on a cohabitant (§ 273.5, subd. (a)); two counts of criminal threats with firearm allegations (§§ 422, 1203.06, subd. (a)(1), 12022.5, subd. (a)); and two counts of possession of a firearm by a felon. (§ 29800, subd. (a)(1).)

On appeal, defendant focuses the bulk of his briefing on his conviction for the first degree felony murder of his wife, the facts of which are somewhat unique. In short, defendant, who has a long history of domestic violence, had an argument with his wife. After she fled in her car, defendant followed, eventually forced her to stop, and coerced her (through force or fear) into his vehicle. As defendant was driving away, his wife opened the door and jumped from the moving vehicle, resulting in her death.

Consistent with the prosecution's theory at trial, the jury was instructed that defendant was guilty of first degree felony murder if the prosecution proved defendant committed a kidnapping; defendant intended to commit the kidnapping; and, while committing the kidnapping, defendant caused his wife's death. The jury received a similar instruction on the special-circumstance allegation.

Defendant argues that the trial court erred by permitting the prosecution to proceed on a legally inadequate theory of felony murder. He contends that under the current felony-murder rule, as amended by Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437), he could be liable for felony murder only if he was proven to be the "actual killer." Because the evidence showed that his wife jumped from the vehicle of her own volition, defendant argues he was not the actual killer and therefore his conviction for first degree felony murder with a special circumstance rests on a legally invalid theory.

---

[1]      Undesignated statutory references are to the Penal Code.

2

Defendant also challenges his judgment of conviction on grounds that: (1) the evidence was insufficient to support the kidnapping verdict; (2) the trial court committed reversible error by failing to instruct the jury on the limited purpose of some of the victim's hearsay statements or, alternatively, that his counsel was ineffective in failing to request such instructions; (3) the trial court erred by failing to instruct the jury on the limited purpose of certain lay opinion testimony or, alternatively, that his counsel was ineffective in failing to request such instructions; and (4) the cumulative effect of the trial court's errors was an unfair trial.

After reviewing the legislative history of Senate Bill 1437 and decisional authority interpreting the term "actual killer," we agree that the defendant's first degree felony murder conviction and special-circumstance finding rests on an invalid legal theory. Accordingly, we shall reverse that conviction and vacate the special-circumstance finding. We otherwise affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In late 2014, the victim, Padao Vue, began an intimate relationship with defendant. In August 2015, she moved into defendant's apartment. That same year, she became pregnant with defendant's child, and in July 2016, she gave birth to their daughter. In February 2016, while she was pregnant, Padao and defendant were "culturally married."

Testimony at trial established that in the Hmong community, to which defendant and Padao belonged, marriage is a patriarchy. Hmong women are taught to be "patient" in marriage and to abide by the husband's wishes. Hmong culture also discourages involving law enforcement in family disputes. When problems arise in a Hmong marriage, they are resolved within the community, often through a "cultural meeting" with elders.

A.      *The December 2014 incident (uncharged)*

In December 2014, shortly after ending a relationship with Stephen V., Padao met with him to discuss what they would do about the apartment and car leases they shared.

3

Stephen testified that Padao showed up with a black eye.  He asked Padao what happened, and she said that defendant punched her.  Stephen told her to report the abuse, but Padao told him she was scared defendant would do something to her family.

After that meeting, Stephen sent a Facebook message to one of Padao's brothers, Seemaown.  Seemaown e-mailed Padao and asked what happened.  Padao explained that defendant thought she was cheating on him.  She asked Seemaown to avoid text messaging her or sending Facebook messages because defendant had all her passcodes.  Months later, Padao—discussing this same incident—told her sister Paduacee that defendant hit her "very hard" and slammed her into a wall because he was mad that she was talking to Stephen.  Padao also discussed the incident with her friend and mother.

B.     *The September 26, 2016 incident (uncharged)*

On September 26, 2016, Padao went to a store with her baby and asked an employee to hide her because she was fleeing her abusive husband.  Padao was crying and sounded afraid.  The employee and a security guard suggested she call the police, but she did not want to because she was too scared.  The employee took Padao to the store's break room, where Padao called friends to come get her.

When her friends arrived at the store, Padao was holding her baby and was acting nervous and scared.  Padao told them that she and defendant had argued the night before, and defendant had pulled out a gun and threatened her and the baby.  Padao said she was scared and had to make up an excuse to get out of the house.

Padao and her baby stayed with friends for a few days.  While there, Padao left a voicemail message for her sister, Pahouang, telling her that she had left defendant and not to answer the door if defendant came looking for her because defendant was being "very violent."

At some point, Stephen visited the home where she was staying, and Padao told him that defendant had pointed at gun at her and her daughter.  Padao also told her mother.

4

Padao reunited with defendant on September 30. Later, in a series of text messages with her sister (Pahouang), Padao explained that she did not seek the family's help because she was scared for them. She wrote, "[Defendant] gets crazy when he's crazy," and "I thought he would actually hurt or kill me."

C.     *The November 2016 incident (counts three and four)*

On the morning of November 15, 2016, Padao appeared at her sister's place of work with her baby. Padao was crying and "very scared." Padao told her sister (Paduacee) that defendant had pointed a gun at her and threatened to kill her and the baby. Padao said that she was afraid of defendant. Padao told Paduacee that she was able to calm defendant down and they went to bed. She escaped with the baby early the next morning. Padao left her phone at home because she had to leave so quickly. Paduacee suggested Padao call the police, but Padao did not want to out of fear and cultural pressure.

Paduacee arranged for Padao and the baby to stay with Paduacee's boyfriend, Sok, for a few days. Padao told Sok that she was concerned for her baby's safety because defendant had pointed a gun at her and threatened to kill her and the baby. Padao also told her mother.

On November 19, Padao text messaged her sister Pahouang that defendant had hit her and wanted to kill her. Pahouang told Padao that the elders of the two families were going to have a cultural meeting about the situation.

Later that day, Padao text messaged her brother, Samuel. In one of the messages, Padao wrote, "Damn, bro[,] what if I go this time and die?" Samuel indicated that he would meet with defendant. Padao warned, "Don't let him drink," "He gets crazy and violent." Later, she added, "Sorry, bro. I didn't plan this. [¶] I just ran for safety. I was so scared I was going to die that night he hit me. [¶] . . . He said he was a changed man and look where I'm at. I'm going through the same [things] as all the other girls in his life." Samuel indicated that he still would talk to defendant, but Padao tried to dissuade

5

him: "Just stop contacting him. I'm scared for everyone in my family already." She continued, "Don't contact him and don't see him. He is not in his right mind and he can burst at any minute. He's put [people] in the hospital before, and [it's] very difficult to calm him down."

On November 20, a cultural meeting of the elders was held at the home of Padao's parents. While preparing for the meeting, Padao told a family member, C.T., that defendant threatened to kill her if she ever left him. In response to an objection from defense counsel, the court gave a limiting instruction that Padao's statement was to be considered only to show her state of mind.

At the cultural meeting, Padao told the elders that defendant had hit her and put a gun to her face while she was holding their baby. She explained that defendant told her to put the baby down and threatened that if she did not, she would see what was going to happen next. She said that defendant also told her to text everyone in the family and "let them know that she was leaving and not to look for her." Padao told the elders that she was afraid of defendant.

After Padao spoke, defendant had an opportunity to respond and said there was nothing he wanted to dispute. When the elders asked defendant about his guns, defendant said that he had given them away. In light of this, the elders asked Padao if she felt safe with defendant. She said no. Nevertheless, the elders decided Padao should return to defendant, and she complied.

A few weeks after the cultural meeting, Padao text messaged Pahouang that defendant "still thinks I cheated on him. He's so stupid." Padao also wrote, "But he's been good. Let's see how long it lasts."

D. *The February 3, 2017 incident (counts one and two)*

Sometime after midnight on February 3, Richard G. was walking near the intersection of 53rd Avenue and 65th Street in Sacramento when he saw defendant's truck traveling southwest on 65th Street toward Stockton Boulevard. He estimated the

6

truck was traveling faster than the speed limit of 45 miles per hour. He could hear a faint sound, possibly crying, emanating from the truck. The passenger side door then opened and a woman (Padao) fell from the truck and "hit the pavement."

The truck stopped and Richard heard the driver (defendant) repeatedly say, "What the fuck are you doing?" Richard called 911 and later watched defendant try to pick Padao off the ground and drag her towards the truck. He then saw defendant get back into the truck and start it, and he believed defendant was trying to leave the scene when police arrived.

Jason J., a security guard, testified that he was driving on 65th Street when he saw defendant's truck stopped in his lane of travel. Defendant was dragging someone toward the passenger side door of the truck, which was open. Jason parked at an adjacent shopping center and approached on foot. Defendant was "a bit hysterical." He was sobbing and crying as he tried to drag Padao. Jason asked what happened. Defendant responded, "We had an argument while at the casino. She opened the door to jump out. I grabbed her shirt, but she slipped out." Jason asked if the woman was still breathing, and defendant said yes. Jason asked defendant if he had called 911, and defendant said he had not. Jason then called 911. Emergency personnel responded and transported Padao to the hospital, where she died.

E. *Initial California Highway Patrol investigation*

California Highway Patrol (CHP) officers responded to the scene at 12:14 a.m. As Sergeant Jake Franklin approached, he saw defendant's truck stopped in the outside lane of the south/westbound side of 65th Street. The passenger door was open and defendant was struggling to move Padao towards the truck. However, by the time he passed and turned around, defendant was down on his knees, cradling Padao's upper body in his arms. Defendant appeared distraught.

Officers looked inside defendant's truck for signs of a struggle, but did not see anything suspicious. There was no purse or cell phone in the truck.

7

Officers found Padao's car parked on the right-hand shoulder on the southbound side of 65th Street, about a quarter of a mile away from where Padao came to rest on the pavement. The car was legally parked on a narrow shoulder in a poorly illuminated area adjacent to a mobile home community. No businesses were located on that stretch of road. The car was 1.7 miles away from Padao's and defendant's home.

The car's interior and dash lights were on, but the engine was not running. There were three gift card/coupons, each valid for a free meal at a fast food restaurant, strewn on the driver's side's floorboard, and two more on the ground outside the driver's side door. There was a pill bottle on the ground in the same area as the free meal coupons. There were two keys on the passenger seat of the car, one of which was a key to a Honda, possibly belonging to Padao's mother. There was no purse or cell phone inside the car. An officer at the scene remarked that "it looked like she left in a hurry."

CHP Officer Michael Phillips interviewed defendant at the scene. Defendant explained that he and Padao had gone to Thunder Valley Casino and that he had gambled away $2,000, which made Padao "very upset." Defendant said they left the casino around 10:00 or 11:00 p.m. and argued on the way home. Once at home, they got into another argument, prompting Padao to leave in her car, a Toyota Camry. Defendant followed her in his truck. He pulled his truck in front of her car and came to a stop, forcing her to stop as well.

Defendant claimed that he then approached Padao's car window, apologized for his behavior, begged her forgiveness, and asked her to get into the truck so they could go home. She complied. He got into her car and parked it on the shoulder of the road. He then drove away with her in the truck, accelerating to about 30 miles per hour, when he remembered he had not locked Padao's car and told her about it. He also asked Padao, "Why are you doing this?" Defendant said that Padao responded, "You know what? Fuck the Camry." She then opened the passenger side door and attempted to jump. Defendant said he grabbed her clothing to stop her, but she pulled away and fell from the

8

truck. He stopped immediately and ran to her. He saw blood coming from her nose and head. He did not call 911. He denied any history of domestic violence.

To the CHP officers at the scene, the incident appeared to be an accident. They determined defendant's arms were not long enough to open Padao's door and push her out while driving. In addition, they found no sign of a struggle or foul play inside the truck. Although crime scene photographs of defendant appear to show scratches on his face and a possible injury to his finger, officers at the scene claimed they checked defendant's face and hands for fresh wounds, and found none.

F. *The coroner's investigation*

Dr. Jason Tovar, a forensic pathologist, conducted an autopsy of Padao and determined that the cause of death was blunt force trauma, particularly to the head. He testified that all of Padao's injuries were consistent with jumping or falling out of a moving car, but it was possible that some of the injuries could have been caused by a physical struggle. After reviewing Tovar's findings, deputy coroner Heather Griffiths concluded that the manner of Padao's death could not be determined. Tovar agreed with her conclusion.

G. *The district attorney's investigation*

At the urging of a victim's advocacy group, the Sacramento County District Attorney's Office initiated its own investigation under the direction of Lieutenant Kirk Campbell. Campbell spoke with Padao's sister, Paduacee, and learned about defendant's history of domestic violence. He reviewed the crime scene photographs and found it "very suspicious" that Padao's car had been parked in such a "desolate," dark, and unsafe area. He also thought it was "very abnormal" for her car to be left unlocked, with the dash lights on, and free meal coupons scattered inside and outside the car. He thought the car's condition was suggestive of a struggle. He also found the location at which Padao exited the truck to be significant, since it was only 0.23 miles from her car and was the first location with businesses around where she could have sought help. Additionally, he

9

believed the photographs of defendant taken at the scene showed scratches on defendant's face and a possible injury to defendant's hand.

Campbell interviewed defendant. Although defendant's account was similar to the one he gave at the scene, there were some key differences. Defendant told him that although Padao had been "mad" at him, they were not really arguing, and she was just giving him the silent treatment. He described "the kind of love [they] had" as "really childish" and that Padao was the type of woman who "just want[ed] attention."

Defendant said that as he followed Padao in his truck, both of their windows were down and he was driving alongside and talking to her, telling her to come home. At some point, he "had enough," so he pulled in front of her car and caused her to stop. He got out of the truck and apologized and asked her to get in the truck, which she did. He then got into her car and parked it off the road. He had to park "real fast" because he was concerned Padao might leave in his truck. When asked why he had decided to leave the car on the side of the road instead of having Padao drive it back home, defendant said that he wanted to drive her around a little bit to calm her down before returning for her car.

Defendant said that after he got back into his truck, they were silent until he remembered that he had not locked Padao's car and told her about it. Padao then pulled the door handle. He tried to grab her, but she pulled away and fell out. He said he was going about 20 miles an hour. He got out of the truck and held her, but denied trying to move her.

Campbell asked defendant about the scratches on his face in the crime scene photographs. Defendant said it was just acne. Defendant denied having a fight with Padao. He denied ever hitting her and said they did not have "that kind of love." He denied ever pointing a gun at her and claimed he had no gun.

A criminalist examined scrapings from Padao's fingernails and determined that a partial DNA profile from one or more of the fingernails on Padao's left hand was

10

consistent with defendant's DNA profile.  However, the small quantity of DNA made it impossible to conclude whether it was the result of Padao scratching defendant.

Based on his investigation, Campbell concluded that Padao's death was a homicide.

H.  *Acts involving Chane Doe (counts five through seven)*

A few months after Padao's death, defendant began an intimate relationship with Chane Doe.  Shortly thereafter, Chane moved in with him.

Chane testified that defendant once choked her and put a gun to her head, and told her to beg for her life.  She was afraid she was going to die.  Lieutenant Campbell interviewed Chane about the incident.  He observed injuries around her neck, which she claimed were from defendant choking her.  Chane said that defendant told her he was not afraid to kill, that he had killed before, and that she would be "next."  She said that defendant had a bad temper and that it was "very scary" living with him.

In June 2017, police searched defendant's home and found two handguns.  One was found under a couch.  The magazine associated with that gun was found in the backyard of a connecting property.  Chane was unsure if it was the gun defendant used to threaten her.  The second gun was found in a purse belonging to Chane.

I.  *Defendant's prior uncharged acts of domestic violence against other victims*

The court permitted the prosecution to introduce evidence of prior uncharged acts of domestic violence by defendant against other women under Evidence Code section 1109 and section 1101, subdivision (b).  This evidence is summarized below:

1.  *Acts related to Kelly Doe (2002 to 2007)*

Kelly Doe was in an intimate relationship with defendant from about 2002 to 2007.  At some point they were culturally married.  Thereafter, Kelly began living with defendant.

11

Late one night, Kelly and defendant got into an argument, during which defendant hit her, threatened her, and poured nail polish down her throat. On another occasion, in May 2005, they got into an argument in the car after he picked her up from a clothing store. At a stop light, he began hitting her with his fist and then forced her out of the car.

On February 11, 2006, defendant showed up at her workplace and accused her of cheating on him with a coworker. Kelly clocked out early and went home with defendant. On the ride home, defendant punched her. He then drove her to a park and told her to take off her clothes in front of strangers. When she refused, he took her home and hit her with plastic sticks and kicked her while wearing boots. He also threatened to scratch her face with a key. The next day, when defendant's grandfather questioned him about hitting Kelly, defendant became enraged and began hitting her again. Defendant's grandfather threatened to call the police, but defendant said he would kill the entire family if the police were called.

In or about July 2007, defendant got angry and punched Kelly, locked her in the bedroom, and told her to go to bed. Kelly crawled out the window, and left defendant for good.

In March 2007, defendant pleaded guilty to assault with force likely to produce great bodily injury (§ 245, subd. (a)(1)) in connection with the incidents involving Kelly.

2.  *Acts related to Anee Doe (2010)*

Anee Doe was in a relationship with defendant in 2010 and lived with him in his house. At some point during their relationship, defendant began physically abusing her. On November 24, 2010, after defendant and Anee had been in a relationship for approximately six months, Anee called her sisters and asked them to help her get away from defendant. While she was hiding in a liquor store and waiting for her family, defendant found her and dragged her from the store and into his car against her will. He then drove her back to his apartment, punching her repeatedly and hitting her with a knife sharpener. She was afraid defendant was going to kill her. At the apartment, defendant

12

continued to beat her. He tied her up, strangled her, and told her he was going to kill her. Eventually the police showed up and interceded after breaking down the apartment door.

In March 2011, defendant pleaded guilty to domestic violence (§ 273.5, subd. (a)) and criminal threats (§ 422) in connection with the incidents involving Anee.

J.  *Domestic violence expert*

David Cropp, a psychotherapist, testified as an expert in intimate partner battery. Cropp explained the cycle of violence that is typical of intimate partner battery. He explained it is typical of victims to not report the violence and to return to their abusers. He also explained that leaving a relationship can be one of the most dangerous times in an abusive relationship because the abuser can view it as an insult to his authority, which may intensify the anger and violence.

K.  *Defense evidence*

Ka X. was working as a security guard near 65th Street and 53rd Avenue on February 3, 2017. He heard car tires screeching and saw a truck stop "real quick." He then heard defendant saying, "Oh, shit, oh shit." As he got closer, he heard defendant say, "Help me. Help me. Somebody help me." He could see Padao lying in defendant's lap.

L.  *Verdict and sentencing*

In a seven-count amended information, defendant was charged with the murder of Padao (§ 187, subd. (a)—count one); kidnapping of Padao (§ 207, subd. (a)—count two); criminal threats against Padao (§ 422—count three); infliction of corporal injury on Chane Doe, a cohabitant (§ 273.5, subd. (a)—count five); criminal threats against Chane Doe (§ 422—count six); and two counts of possession of a firearm by a felon. (§ 29800, subd. (a)(1)—counts four & seven.) The information further alleged, as a special circumstance to count one, that the murder was committed while defendant was engaged in the commission of the kidnapping. (§ 190.2, subd. (a)(17).) It also alleged, as to counts three and six, that defendant personally used a firearm in the commission of the

13

offense.  (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a).)  Lastly, it alleged that defendant suffered a prior serious felony conviction pursuant to section 667, subdivision (a)(1), and the Three Strikes law (§§ 667, subd. (b)-(i), 1170.12), as well as a prior domestic violence conviction.  (§ 273.5, subd. (f)(1).)  Defendant pleaded not guilty and denied all the allegations.

The jury found defendant guilty of all counts, found the murder to be first degree, and found true the special circumstance and firearm allegations.  Following a bench trial, the court found true the prior conviction allegations.

The trial court sentenced defendant to state prison for life without the possibility of parole on count one, plus an additional consecutive determinate sentence of 20 years 8 months as follows:  on each of counts three and six, defendant was sentenced to eight months, doubled for the strike, plus one year four months for the firearm enhancement; on each of counts four and seven, defendant was sentenced to eight months, doubled for the strike; on count five, defendant was sentenced to one year four months, doubled for the strike; plus five years for the serious felony enhancement for each of the determinate and indeterminate terms.  The court imposed and stayed sentence on count two under section 654.  The sentence was imposed consecutive to defendant's sentence of 18 years eight months in Placer County Superior Court case No. 62-152970B, in which defendant was convicted of kidnapping (§ 207, subd. (a)); possession of a firearm by a felon (§ 29800, subd. (a)); and accessory to murder after the fact.  (§ 32.)  Defendant filed a timely notice of appeal.

DISCUSSION

I

*Sufficiency of Evidence:  Kidnapping*

Defendant argues that the evidence was insufficient to support his conviction of kidnapping Padao.  We disagree.

14

We review the record of conviction in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) In making our determination, we do not reweigh the evidence or reevaluate the credibility of witnesses. (*Ibid.*) Rather, we view the facts in the light most favorable to the judgment and presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence. (*Ibid.*) The relevant inquiry is not whether we believe the evidence establishes guilt beyond a reasonable doubt, but whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) Under this standard, the defendant bears an "enormous burden" in demonstrating that the evidence does not support the conviction. (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.)

The standard of review is the same when the conviction rests primarily on circumstantial evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citation.]" ' [Citation.]" (*Id.* at pp. 1053-1054.)

Section 207, subdivision (a) defines the offense of kidnapping. It provides: "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping."

15

(§ 207, subd. (a).) To prove that a defendant is guilty of kidnapping, the prosecution must prove that: (1) the defendant took, held, or detained another person by using force or by instilling reasonable fear; (2) using that force or fear, the defendant moved the other person (or made the other person move) a substantial distance; and (3) the other person did not consent to the movement. (*People v. Perkins* (2016) 5 Cal.App.5th 454, 464; CALCRIM No. 1215.)

The force used against the victim need not be physical. (*People v. Majors* (2004) 33 Cal.4th 321, 326-327 (*Majors*).) As the language suggests, a kidnapping can be accomplished not only by force, but also by threats of force or other means of instilling fear. (*People v. Moya* (1992) 4 Cal.App.4th 912, 916; see also *Majors, supra*, at p. 327 [force and fear are not mutually exclusive].) Fear of injury is not required. (*People v. Montalvo* (2019) 36 Cal.App.5th 597, 616.) Movement is deemed forcible where it is accomplished through the giving of threats or orders which the victim feels compelled to obey. (*Ibid.*; *Majors*, at p. 327.)

Because the gravamen of the offense requires " 'some form of compulsion,' " the concepts of consent and force (or fear) " 'are clearly intertwined.' " (*Majors, supra*, 33 Cal.4th at p. 327.) Kidnapping must be "against the will" of the victim. (*People v. Williams* (2013) 57 Cal.4th 776, 781; accord, *People v. Moya, supra*, 4 Cal.App.4th at p. 916 [force or fear sufficient to overcome the person's free will].) If the victim voluntarily consented to the movement, there was no kidnapping. (*People v. Isitt* (1976) 55 Cal.App.3d 23, 28.) A defendant's reasonable, good faith belief that the victim consented to the movement is a complete defense. (*Ibid.*)

Defendant challenges the sufficiency of the evidence to support the findings that he used force or fear to overcome Padao's will and that she did not accompany him voluntarily. Defendant argues that the prosecution's case was based entirely on speculative circumstantial evidence and that there was no evidence from which a rational trier of fact could conclude beyond a reasonable doubt that he was guilty of kidnapping.

16

We are not persuaded. The evidence presented to the jury, circumstantial as it was, supported the finding that defendant kidnapped Padao.

The jury heard evidence of defendant's history of domestic violence involving Padao and other women. The evidence showed defendant had a propensity to commit violent and abusive acts against women with whom he had romantic relationships.

Both Kelly and Anee, with whom defendant had a relationship prior to Padao, testified that defendant hit them, threatened them, and caused them to fear for their lives. Kelly testified that on one occasion defendant hit her and poured nail polish down her throat. She recalled two instances in which defendant punched her while she was riding in his car. Anee testified that once, after defendant had been physically abusive with her, she tried to run away, but defendant found her, dragged her to his car, and punched her while driving back to the apartment, where he continued to beat her.

The jury also heard evidence of defendant's violent acts involving Padao, including at least one instance in which defendant pointed a gun at her and their child. The jury heard that Padao was afraid of defendant and that she had run away from him more than once because she was scared he was going to hurt or kill her. The last of these incidents occurred only about two months before her death.

In addition, the jury heard testimony about uncharged acts of violence against Chane that occurred after Padao's death. Chane testified that defendant choked her, put a gun to her head, and told her to beg for her life. She feared that she was going to die.

This evidence demonstrated that defendant had a propensity to use force and fear against women, and supported a finding that Padao was afraid of defendant, especially when he was angry or upset. In this context of domestic violence and fear, the jury heard the evidence relating to what transpired on the night of Padao's death.

It is undisputed that on the night of her death, Padao and defendant had an argument and Padao left the house driving her own car. Defendant followed in his truck.

17

Defendant eventually "had enough," so he pulled his truck in front of Padao and forced her to stop.

In his statements to the police, defendant claimed that Padao willingly left her car and got into his truck. But the jury reasonably could find defendant's account was not credible, since he was not truthful with investigators about other matters, including his history of domestic violence.

In contrast, there was abundant circumstantial evidence that, when viewed with the evidence of defendant's history of domestic violence and Padao's fear of defendant, supported an inference that Padao got into defendant's truck against her will. Such evidence included: (1) defendant admittedly forced Padao to stop; (2) Padao's car was found unlocked, with its dash lights on, in an unusual and unsafe place to park a car, less than two miles from Padao and defendant's home; (3) there was evidence suggestive of a struggle, including the free meal coupons scattered inside and outside Padao's car, the photographs that appeared to show scratches on defendant's face, and the DNA recovered from Padao's fingernails; (4) defendant admitted he was concerned that Padao might drive away in his truck; (5) Padao was in the truck for less than a minute (0.23 miles) before jumping out; (6) Padao jumped from the truck at the first location where she might have been able to seek help; and (7) a witness heard a faint sound, possibly crying, emanating from the truck just before Padao jumped from the vehicle.

The jury also could consider defendant's actions after the incident as evidence of defendant's consciousness of guilt. For example, two witnesses saw defendant try to pick Padao off the ground and drag her towards his truck. One witness testified that he saw defendant get back into his truck and start it, as if trying to leave the scene. It was undisputed that defendant did not call 911. He also lied to the police when they asked if he had a history of domestic violence.

Taking all the evidence into consideration, the jury reasonably could have concluded, without speculation, that defendant used force or fear to compel Padao to get

18

into his truck, that Padao did not consent to the movement, and that defendant could not actually and reasonably have believed that she did.

Defendant points to weaknesses in the evidence and argues there are other inferences that the jury could have drawn from the evidence. We do not disagree that other reasonable inferences were possible. However, the issue on appeal is whether any rational trier of fact could have been persuaded beyond a reasonable doubt that defendant committed the crime charged. (*People v. Rodriguez, supra*, 20 Cal.4th at p. 11.) We may not reverse the judgment merely because we believe the circumstances might also support a contrary finding. (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139.) Viewing all the evidence in the light most favorable to the verdict, as we must, we conclude that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

## II

### *Felony Murder and Special Circumstance*

To establish defendant's liability for first degree felony murder, the prosecution relied on the theory that Padao jumped from defendant's truck to escape the kidnapping.[2] The prosecution argued that even if defendant did not personally kill Padao, he still was liable for her murder because he committed an inherently dangerous felony—the kidnapping—that proximately caused her death.

The trial court instructed the jury in conformity with the prosecution's theory. It told the jury that defendant was guilty of first degree felony murder if the People proved

---

[2]     In addition to first degree felony murder, the prosecution also argued that defendant could be convicted under a theory of second degree murder with malice aforethought because he engaged in an act, the natural and probable consequence of which was dangerous to human life, and he knew that his conduct was dangerous to human life and acted with a conscious disregard for human life. (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.)

19

that (1) defendant committed the crime of kidnapping; (2) defendant intended to commit a kidnapping; and (3) while committing the kidnapping, defendant caused the death of another person (even if the killing was unintentional, accidental, or negligent). (CALRIM No. 540A.)[3]  The court instructed the jury that an act causes death if the death is a direct, natural, and probable consequence of the act and a reasonable person would know it is likely to happen if nothing unusual intervenes.  (CALCRIM No. 520.)  It further instructed the jury that there may be more than one cause of death; and that an act causes death only if it is a substantial factor in causing the death, and the death would not have happened without the act.  (CALCRIM Nos. 520, 620.)

On appeal, defendant contends that the trial court erred by permitting the prosecution to proceed on a legally inadequate theory of felony murder.  Defendant relies upon cases that hold that the felony-murder rule does not apply where the killing is committed by the victim.  With the enactment of Senate Bill 1437, defendant further argues that he could be held liable for felony murder only if he was the "actual killer."

Because the evidence showed that Padao jumped from the truck of her own volition, and there was no evidence that defendant directly caused her death, defendant argues that he was not the actual killer as a matter of law.  Thus, he contends, the trial court erred by permitting the prosecution to proceed on a legally inadequate theory and instructing the jury that it could convict defendant of felony murder (with a special circumstance) on that theory.[4]  For the reasons given below, we agree.

---

**3**   The court's instruction for the special-circumstance allegation was substantially the same.  (CALCRIM No. 730.)

**4**   Although defendant failed to object to the prosecutor's theory and the court's instructions, we conclude he has not forfeited the issue because it affected his substantial rights.  (§ 1259; *People v. Smithey* (1999) 20 Cal.4th 936, 976-977, fn. 7; *People v. Garcia* (2020) 46 Cal.App.5th 123, 154 (*Garcia*).)

20

A.    *The felony-murder rule*

Murder is defined as "the unlawful killing of a human being . . . with malice aforethought."  (§ 187, subd. (a).)  The malice required by section 187 may be express or implied.  It is express when there is a manifest intent to kill.  (*People v. Gentile* (2020) 10 Cal.5th 830, 844 (*Gentile*), superseded by statute as stated in *People v. Hola* (2022) 77 Cal.App.5th 362, 370.)  It is implied if someone kills with " 'no considerable provocation . . . or when the circumstances attending the killing show an abandoned and malignant heart.' "  (*Ibid*.)  Implied malice has both physical and mental components.  (*People v. Solis* (2020) 46 Cal.App.5th 762, 774.)  The physical component is satisfied by the performance of an act, the natural consequences of which are dangerous to human life.  The mental component is established when the defendant knows his or her conduct endangers another person's life yet acts with a conscious disregard for life.  (*Ibid*.)  When a person directly perpetrates a killing, the perpetrator must possess malice aforethought.  (*Gentile, supra*, 10 Cal.5th at p. 844.)  When a person directly aids and abets a murder, the aider and abettor must act with malice aforethought.  (*Ibid*.)

In California, the felony-murder rule provides an exception to the malice requirement for murder.  (*People v. Solis, supra*, 46 Cal.App.5th at p. 774.)  The rule imputes the requisite malice to those who commit a homicide during the perpetration of a felony inherently dangerous to human life.  (*People v. Cruz* (2020) 46 Cal.App.5th 740, 752.)  The requisite mental state is simply the specific intent to commit the underlying felony.  (*People v. Cavitt* (2004) 33 Cal.4th 187, 197.)  The purpose of the rule is to deter criminals from killing by holding them strictly responsible for deaths that occur during the perpetration (or attempted perpetration) of an inherently dangerous felony, regardless of whether the killing was done by the perpetrator or an accomplice, and regardless of whether the killing was intentional, negligent, or accidental.  (*Ibid*.; accord, *People v. Fuller* (1978) 86 Cal.App.3d 618, 622.)

21

Almost since its inception, the felony-murder rule has been criticized by some courts and commentators as an artificial and unnecessary doctrine that erodes the relation between criminal liability and moral culpability. (See, e.g., *People v. Washington* (1965) 62 Cal.2d 777, 783; *Carlos v. Superior Court* (1983) 35 Cal.3d 131, 146, superseded by statute as stated in *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 348; *People v. Slaughter* (1984) 35 Cal.3d 629, 654; *People v. Dillon* (1983) 34 Cal.3d 441, 494 (conc. opn. of Bird, C. J.).) As a result, some courts—including our Supreme Court—have stated that the rule should be viewed with disfavor and given the narrowest possible application consistent with its ostensible purpose. (See *People v. Smith* (1984) 35 Cal.3d 798, 803; *People v. Clem* (2000) 78 Cal.App.4th 346, 353; *People v. Esquivel* (1994) 28 Cal.App.4th 1386, 1396.) This has led to some inconsistency in how the felony-murder rule is applied, particularly in situations where the lethal act was committed by a person other than the defendant or an accomplice acting in furtherance of the underlying felony.[5] (Compare *Washington, supra*, at p. 781 [rule does not apply where accomplice killed by victim because killing was not committed in perpetration of robbery] and *People v. Jennings* (1966) 243 Cal.App.2d 324, 329 [rule does not apply where accomplice accidentally killed self while engaged in arson] with *People v. Stamp* (1969) 2 Cal.App.3d 203, 209-211 [felony murder applies where there is substantial evidence to

---

[5]    There also has been some uncertainty about when a nonkiller accomplice may be held liable for a killing by an accomplice. In *People v. Cavitt, supra*, 33 Cal.4th at page 196, the California Supreme Court clarified the "complicity aspect" of the felony-murder rule, holding that rule does not apply to nonkillers where the act resulting in death is completely unrelated to the underlying felony other than occurring at the same time and place. The court held there must be both a causal relationship and a temporal relationship between the underlying felony and the act resulting in death. (*Ibid*.) The causal relationship is established by a logical nexus between the felony and the homicidal act, and the temporal relationship is established by proof the felony and the homicidal act were part of one continuous transaction. (*Ibid*.; accord, *People v. Wilkins* (2013) 56 Cal.4th 333, 346-347.)

prove robbery caused victim's heart attack] (superseded by statute as stated in *People v. Flint* (2022) 75 Cal.App.5th 607, 609), *People v. Hernandez* (1985) 169 Cal.App.3d 282, 287 [same], and *People v. Billa* (2003) 31 Cal.4th 1064, 1069-1072 [active participant in arson liable for accidental death of accomplice].)

      B.      *Senate Bill 1437*

In 2017, the Legislature adopted Senate Concurrent Resolution No. 48, which recognized the need for statutory reform related to the felony-murder rule (as well as the natural and probable consequences theory of aider and abettor liability).  (Sen. Conc. Res. No. 48, Stats. 2017 (2017-2018 Reg. Sess.) res. ch. 175.)  The recitals preceding the resolution explained that:  "It is a bedrock principle of the law and of equity that a person should be punished for his or her actions according to his or her own level of individual culpability."  (*Ibid*.)  "In California, defendants in felony murder cases are not judged based on their level of intention or culpability but are sentenced as if they had the intent to kill even if the victim of the underlying felony actually commits the fatal act."  (*Ibid*.)  "[A] prosecutor only needs to prove that the defendant is involved in the commission . . . of a statutorily enumerated felony . . . to secure a first-degree murder conviction even if the defendant did not do the killing, and even if the killing was unintentional, accidental, or negligent."  (*Ibid*.)  Accordingly, the Legislature recognized "the need for statutory changes to more equitably sentence offenders in accordance with their involvement in the crime."  (*Ibid*.)

The following year, the Legislature relied on Senate Concurrent Resolution No. 48 in enacting Senate Bill 1437.  (Stats. 2018, ch. 1015, § 1(c).)  Among other things, Senate Bill 1437 amended the mens rea requirement for murder and narrowed the circumstances under which a defendant can be convicted under the felony-murder rule.  (*People v. Wilkins* (2021) 68 Cal.App.5th 153, 157.)  Specifically, Senate Bill 1437 amended section 188 to provide that, except when the felony-murder rule applies, a murder conviction requires proof of malice aforethought, which "shall not be imputed to a person

23

based solely on his or her participation in a crime." (§ 188, subd. (a)(3).) By requiring proof of malice except in cases of felony murder, Senate Bill 1437 eliminated aiding and abetting murder liability under a natural and probable consequences theory. (*Gentile, supra*, 10 Cal.5th at pp. 847-848, superseded by statute as stated in *People v. Hola, supra*, 77 Cal.App.5th at p. 370.)

Senate Bill 1437 also amended section 189, by adding a new subdivision (e), relating to the felony-murder rule. As amended, section 189 provides that a participant in the perpetration of a qualifying felony is liable for felony murder only if the person (1) actually killed the victim; (2) aided, assisted, or induced the murder with the intent to kill; or (3) was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of section 190.2. (§ 189, subd. (e)(1)-(3).) By adding subdivision (e) to section 189, Senate Bill 1437 made the crime of felony murder subject to the same elements of proof required for a felony-murder special-circumstance finding under section 190.2. (*People v. Farfan* (2021) 71 Cal.App.5th 942, 953-954; *People v. Pineda* (2021) 66 Cal.App.5th 792, 798, review granted Sept. 29, 2021, S270513.)

C. *Standard of review*

In criminal cases, a trial court has a sua sponte duty to instruct on the general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case. (*People v. Campbell* (2020) 51 Cal.App.5th 463, 493.) We apply a de novo standard when determining whether jury instructions were complete and correctly stated the law. (*Ibid*.) We consider the challenged instruction in the context of the instructions and record as a whole to determine whether it was reasonably likely the jury misapplied the law. (*People v. Mehserle* (2012) 206 Cal.App.4th 1125, 1155.)

D. *Analysis*

As noted, Senate Bill 1437 amended the felony-murder rule to ensure that liability is not imposed on a person "who is not the actual killer, did not act with the intent to kill,

or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1(f).) The dispute in this case is over the meaning of the undefined term "actual killer."

Defendant argues that the term should be interpreted "literally" to mean the person who *personally* killed the victim. Under this view, personally killing the victim is not the same as proximately causing the victim's death. Thus, even in a single perpetrator case like this one, the felony-murder rule would not apply unless, during the commission of the felony, the defendant *personally committed* the act that *directly* caused the victim's death. Here, there was not any evidence to show that defendant personally killed Padao by pushing her from the moving the vehicle, so the prosecution relied exclusively on the theory that the kidnapping proximately caused her death, and the trial court instructed the jury in conformity with that theory. Consequently, defendant argues, the jury instructions improperly allowed the jury to conclude that he was an actual killer and convict him of felony murder based on general causation principles.[6]

The Attorney General argues that the term "actual killer" should be given a broad interpretation, and that Senate Bill 1437 was focused solely on accomplice liability for felony murder and that the Legislature used the term "actual killer" merely to distinguish between a perpetrator and an ordinary aider and abettor in cases involving multiple actors. The Attorney General contends that the Legislature did not intend to impose a heightened causation or culpability standard for determining whether a defendant in a single perpetrator case was a killer. Rather, the Legislature intended the term "actual killer" to include any person whose conduct during the commission of a qualifying felony caused the victim's death, regardless of whether the death was intentional or accidental.

---

[6] Defendant alternatively argues that because the evidence did not permit any other inference as to the *direct* cause of Padao's death, the evidence was insufficient to support his conviction of felony murder and the special-circumstance finding.

25

Under the Attorney General's interpretation, the defendant need not have "personally" or "directly" killed the victim. It is sufficient if the defendant's felonious conduct was a substantial factor in causing the victim's death. According to the Attorney General, "when only one perpetrator is involved [in a qualifying felony] and a death results, the sole perpetrator is by default a substantial factor in the death and the actual killer." Thus, the Attorney General contends there was no error; the prosecution's theory was legally valid and the jury was properly instructed.

The interpretation of a statute is a question of law as to which we exercise our independent judgment. (*People v. Lewis* (2021) 11 Cal.5th 952, 961.) As in any case involving statutory interpretation, our fundamental task is to determine the Legislature's intent to effectuate the purpose of the law. We begin by examining the words of the statute, giving them a plain and commonsense meaning, in context, keeping in mind the nature and purpose of the statute. (*Ibid.*) If the statutory language is clear and unambiguous, there is no need for further construction. (*People v. Preston* (2015) 239 Cal.App.4th 415, 421-422.) But if the language is unclear or ambiguous, the court may refer to other indicia of the intent, such as legislative history. (*Id.* at p. 422.)

Here, we conclude that the term "actual killer," as used in section 189, is reasonably susceptible to the parties' competing interpretations. Thus, to resolve this ambiguity, we turn to the legislative history.

The history of Senate Bill 1437 suggests that the Legislature's concern was with the breadth of the felony-murder rule generally, not just its application to accomplices. For example, in describing the need for the bill, the Assembly Committee on Public Safety stated that, "[u]nder the current felony murder rule in California, criminal liability for a homicide is very broad. A defendant may be convicted of first-degree murder under the felony-murder rule if the defendant is involved in the commission . . . of a statutorily-enumerated felony (Penal Code § 189), even if the defendant did not do the killing, and even if the killing was unintentional, accidental, or negligent." (Assem. Com. on Public

Safety, June 26, 2018, Rep. on Sen. Bill No. 1437 (2017-2018 Reg. Sess.) as amended May 25, 2018, p. 5.)  The Committee's report noted the " 'harshness and inequity' " of the felony-murder rule, and questioned whether the rule is necessary and whether it provides an effective deterrent to criminal behavior.  (*Id*. at pp. 4-7.)  The Committee's report also observed that the United States is the only country in the world to use the felony-murder rule and that several states have taken steps to ban it.  (*Id*. at p. 5.)

The Senate Committee on Public Safety quoted the author of the bill as observing that prosecutors were able to " 'replace the intent to commit murder with the intent to commit a felony if the felony results in a death.  Thus a person [could] be found guilty of murder if a death occurs while a felony is committed,' " and it did not matter whether the death was intentional, accidental, unintentional, or unforeseen.  (Assem. Com. on Public Safety*, supra*, at p. 4.)  The rule " 'caused disproportionately long sentences for people who did not commit murder, and who in some cases had, at best, very peripheral involvement in the crime that resulted in a death.' "  (*Ibid*.)  The author stated that Senate Bill 1437 was intended " 'to restore proportional responsibility in the application of California's murder statute reserving the harshest punishments for *those who intentionally planned or actually committed the killing*.' "  (*Id*. at p. 3, italics added.)

Consistent with this legislative history, when Senate Bill 1437 was enacted the Legislature found and declared that in order to "more equitably" sentence offenders in accordance with their individual involvement and culpability in homicides, it is "necessary to amend the felony murder rule . . . to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1.)

The legislative history also supports the view that the Legislature understood the term "actual killer" to mean the person who "personally" commits the homicidal act.  As originally proposed, section 188, subdivision (a)(3) provided:  "Malice shall not be

imputed to a person based solely on his or her participation in a crime.  A participant or conspirator in the commission or attempted commission of a felony inherently dangerous to human life may be imputed to have acted with implied malice *only if he or she personally committed the homicidal act*."  (Sen. Bill No. 1437, as introduced Feb. 16, 2018, italics added.)  Section 189, subdivision (e), in turn, originally provided:  "A participant or conspirator in the perpetration . . . of a [qualifying felony] in which a death occurs is liable for murder only if one of the following is proven:  [¶]  (1) The person *personally committed the homicidal act*.  [¶]  (2) The person acted with premeditated intent to aid and abet an act wherein a death would occur.  [¶]  (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life."  (Sen. Bill No. 1437, as introduced Feb. 16, 2018, italics added.)

Consistent with this draft language, the stated purpose of the bill was to "revise the felony murder rule to prohibit a participant in the commission or attempted commission of a felony that has been determined as inherently dangerous to human life to be imputed to have acted with implied malice, unless he or she personally committed the homicidal act."  (Sen. Com. on Public Safety, Apr. 24, 2018, Rep. on Sen. Bill No. 1437 (2017-2018 Reg. Sess.), p. 2.)

Without explanation, the Legislature later removed the phrase "personally committed the homicidal act" from the bill and replaced it, in section 189, subdivision (e)(1), with the term "actual killer."  But even after this change, the Senate Rules Committee described the purpose of the bill as revising the felony-murder rule to prohibit imputation of malice unless the person "personally committed the homicidal act."  (Sen. Rules Com., Aug. 20, 2018, Rep. on Sen. Bill No. 1437 (2017-2018 Reg. Sess.), p. 7.)  Thus, the legislative history supports the view that the Legislature understood the terms to be equivalent.

The Attorney General argues that the title used in the Legislative Counsel's Digest of Senate Bill 1437—"Accomplice liability for felony murder"—proves the Legislature

intended the changes to the felony-murder rule to apply only in cases involving accomplice liability. Although the Legislative Counsel's Digest can be a valuable tool in assessing legislative intent, the title employed by Legislative Counsel is not part of the law and cannot alter the scope, meaning, or intent of the bill itself. (*California Teachers' Assn. v. Governing Board* (1983) 141 Cal.App.3d 606, 614; see also *Monterey/Santa Cruz etc. Trades Council v. Cypress Marina Heights LP* (2011) 191 Cal.App.4th 1500, 1514.) If the Legislature's intent had been to limit its changes to accomplice liability, the text of Senate Bill 1437 presumably would have said so. Here, the word "accomplice" is never used in the text and there is nothing in the language of section 189, subdivision (e) which limits its application to cases involving accomplices.

Instead, under Senate Bill 1437, the only exception to the malice requirement imposed by section 188 is the felony-murder rule stated in section 189, subdivision (e), which, by its plain terms, applies to any "participant in the perpetration or attempted perpetration of a [qualifying] felony . . . in which a death occurs." (§ 189, subd. (e).) Further, the Legislature's stated intent in amending the felony-murder rule was to more equitably sentence "offenders"—not just accomplices—in accordance with their involvement in homicides. (Stats. 2018, ch. 1015, § 1(b).) While it is true that Senate Bill 1437 substantially modified the law relating to accomplice liability for felony murder, it is equally evident that the Legislature was concerned about more than the liability of accomplices and wanted to address some of the broader criticisms of the felony-murder rule.

The language of the statute also belies any suggestion that the Legislature intended the term "actual killer" to include any participant in a qualifying felony that resulted in death. Before Senate Bill 1437 was enacted, a defendant who intended to commit a qualifying felony could be convicted of murder for a killing during the felony without further examination of his or her mental state. (*People v. Superior Court* (*Gooden*) (2019) 42 Cal.App.5th 270, 275.) However, Senate Bill 1437 narrowed the felony-

murder rule so that it applies only if the defendant was a participant in the perpetration or attempted perpetration of a qualifying felony in which death occurred *and* the defendant (1) was the actual killer; (2) was not the actual killer but, with the intent to kill, aided and abetted the actual killer in the commission of murder; or (3) was a major participant in the underlying felony and acted with reckless indifference to human life. (§ 189, subd. (e).)

If mere participation in a qualifying felony that results in death were sufficient to qualify one as the "actual killer," the language in section 189, subdivision (e)(1) would be superfluous.[7] It is, of course, well established that interpretations that render part of a statute superfluous are to be avoided. (*Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1207.)

In light of Senate Bill No. 1437's intent to impose punishment commensurate with the person's culpability, we conclude that the term "actual killer" was intended to limit liability for felony murder—in cases where section 189, subdivision (e)(2) or (e)(3) do not apply—to the actual perpetrator of the killing, i.e., the person (or persons) who personally committed the homicidal act. In other words, the intent was to conform California law to the "agency theory" of felony murder liability, under which criminal culpability is restricted to deaths directly caused by the defendant or an accomplice, as distinguished from the "proximate cause" theory of felony murder, under which a defendant is responsible for any death that proximately results from the unlawful activity. (See 40 Am.Jur.2d (2022) Homicide, § 60; see also *Comer v. State* (Del. 2009) 977 A.2d 334, 341; *State v. Small* (La. 2012) 100 So.3d 797, 806-809.)

---

**7** It also would raise questions as to the purpose of section 189, subdivision (e)(3), since a "major participant in the underlying felony" would seemingly always be liable as an "actual killer" if the felony were a substantial factor in the victim's death.

Our interpretation is consistent with precedent discussing what it means to be an "actual killer" for purposes of section 190.2, the felony-murder special-circumstance statute. Section 190.2 sets forth the special circumstances under which murderers and accomplices may be punished by death or life without possibility of parole. (§ 190.2.) The statute distinguishes between someone who was the "actual killer" and others who aid in the murder or the underlying felony. (§ 190.2, subds. (b)-(d).) Generally, the "actual killer" need not have acted with any intent to kill. (§ 190.2, subd. (b).) But for those who are not the actual killer, a felony-murder special circumstance can be found true only if the person aids and abets the murder with an intent to kill; or aids and abets the underlying felony as a "major participant" acting with "reckless indifference to human life." (§ 190.2, subds. (c), (d).)

The elements of section 190.2, subdivisions (b) through (d), are designed to satisfy the constitutional limits on executing felony murderers under the Eighth Amendment, as articulated by the United States Supreme Court in *Tison v. Arizona* (1987) 481 U.S. 137 [95 L.Ed.2d 127] (*Tison*) and *Enmund v. Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140]. (*People v. Banks* (2015) 61 Cal.4th 788, 794 (*Banks*).) As our Supreme Court has explained it, *Tison* and *Enmund* collectively place the conduct of felony murder participants on a spectrum, "with felony-murder participants eligible for death only when their involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions." (*Banks, supra*, at p. 794.) At one end of the spectrum are minor participants, who were not on the scene, and who neither intended to kill nor were found to have had any culpable mental state, for whom death is a disproportional and impermissible punishment. (*Id*. at p. 800.) At the other end of the spectrum are the *actual killers* and those who attempted or intended to kill, for whom a punishment of death is constitutionally permissible. (*Ibid*., italics added; see also *Tison, supra*, 481 U.S. at p. 150.) In *Tison*, the Supreme Court addressed "the gray area in

31

between, the proportionality of capital punishment for felony-murder participants who, like the [defendants], fell 'into neither of these neat categories.' " (*Banks*, at p. 800.)

*Tison* concerned whether death sentences were constitutionally permissible for two accomplices to a felony murder who participated fully in the underlying felony and watched when the homicides took place, but who neither intended to kill the victims nor inflicted the fatal wounds. (*Tison, supra*, 481 U.S. at pp. 138, 143.) In *Tison*, the court held that that major participation in the underlying crime, coupled with reckless indifference to human life, was *sufficient* culpability for the death penalty to be imposed. (*Id*. at p. 158.) Important here is that even though the court in *Tison* acknowledged the "deaths would not have occurred but for [defendants'] assistance," they were not "actual killers." (*Id*. at pp. 143, 150.)

Since *Tison*, our Supreme Court has repeatedly characterized the case as articulating the constitutional limits on executing felony murderers "who did not personally kill," equating the term "actual killer" with someone who "personally killed" the victim. (*People v. Jennings* (1988) 46 Cal.3d 963, 979; *People v. Young* (2005) 34 Cal.4th 1149, 1204; *People v. Jones* (2003) 30 Cal.4th 1084, 1119-1120; *Banks, supra*, 61 Cal.4th at p. 794; see also *In re Hardy* (2007) 41 Cal.4th 977, 1025.)

In *Garcia, supra*, 46 Cal.App.5th 123, California's Sixth Appellate District held that CALCRIM No. 730, the standard instruction for the felony-murder special circumstance, was inconsistent with the law because it allowed the jury to find the defendant guilty as an "actual killer" based on general causation principles. (*Id*. at p. 156, fn. 33.) The prosecution had argued the defendant was an "actual killer" because he handed the " 'instrumentality of death' " (a roll of duct tape) to a coperpetrator who used it to cover the victim's face. (*Id*. at pp. 149, 152, 154.) Consistent with the prosecution's argument, the trial court instructed the jury that it could find the special circumstance true if defendant committed an act that proximately caused the victim's death. (*Id.* at pp. 143, 149-150, 155.) The appellate court held that this was error because the instructions failed

to limit liability to the "actual killer" and therefore permitted the jury to find the defendant guilty based on an invalid legal theory. (*Id*. at pp. 150, 155.) The Court of Appeal held that the jury should have been instructed that it could find the special-circumstance allegation true only if the prosecution proved the defendant " 'personally killed' " the victim. (*Id*. at p. 155.)

The court in *Garcia* explained that the meaning of " 'actual killer' " under section 190.2 is literal: the actual killer is the one who personally killed the victim. (*Garcia, supra*, 46 Cal.App.5th at pp. 151-152.) To personally kill the victim is to directly cause the victim's death, not just to proximately cause it. (*Id*. at p. 151.) While handing a murder weapon to the person who actually kills the victim might result in liability as an aider and abettor under section 190.2, subdivision (c) or (d), it does not qualify as an act of an "actual killer" under section 190.2, subdivision (b). (*Garcia*, at p. 154.) Thus, the special circumstance was submitted to the jury on a legally invalid theory, that is, that the defendant could be found liable as the actual killer just for handing duct tape to a coperpetrator, even if the defendant did not personally participate in placing the tape on the victim's face. (*Id*. at pp. 154-155.)

Our interpretation of the term "actual killer" in section 189 aligns with the definition in *Garcia*. By amending section 189 to add subdivision (e), Senate Bill 1437 made the elements required to prove felony murder essentially coextensive with the elements for a felony-murder special-circumstance finding under section 190.2. (*People v. Pineda, supra*, 66 Cal.App.5th at p. 798, rev.gr.; *People v. Farfan, supra*, 71 Cal.App.5th at pp. 953-954.) Although the statutes serve different purposes, nothing suggests the Legislature intended the term "actual killer" to have one meaning for purposes of the felony-murder rule, and a different meaning under the felony-murder special-circumstance statute. To the contrary, as the former expressly incorporates language from (and references) the latter, the logical implication is that the Legislature

intended them to be the same. Accordingly, *Garcia* supports our interpretation that the term "actual killer" means the person (or persons) who personally killed the victim.

We find further support for our interpretation in the Fourth Appellate District's recent opinion in *People v. Lopez* (2022) 78 Cal.App.5th 1. In the course of deciding whether the defendant made a prima facie case for resentencing relief under section 1170.95, the appellate court considered what it means to be an "actual killer" for purposes of section 189, subdivision (e)(1). (*Lopez, supra*, at p. 16.) Relying on *Garcia*, the appellate court concluded that the term "actual killer" means someone who personally killed the victim, not someone who merely commits an act that is a proximate cause of the victim's death. (*Id*. at pp. 16-19.)

The jury instructions here have the same flaw as those in *Garcia*. They allowed the jury to find defendant guilty of felony murder, and to find the special circumstance true, if it determined that defendant "caused" Padao's death based on general causation principles, even if it did not find, beyond a reasonable doubt, that he personally committed the homicidal act. The instructions were inadequate because jurors were not provided a proper definition of "actual killer." The jury was permitted to find defendant guilty of felony murder, with a special circumstance, based on an invalid legal theory.

Where, as here, the verdict was based on a legally invalid theory, reversal is required unless we can say, beyond a reasonable doubt, that the error did not contribute to the verdict. (*People v. Lewis* (2006) 139 Cal.App.4th 874, 884.) No such determination is possible here. Accordingly, we shall reverse the judgment of conviction for first degree felony murder, vacate the special-circumstance finding, and remand the case to the trial court.

Because the evidence does not permit any inference that defendant was the direct cause of Padao's death, we also agree with defendant that the evidence was insufficient to support the theory of guilt on which the jury was instructed. Thus, defendant cannot be retried on the felony-murder theory or the felony-murder special circumstance. (*Burks v.*

*United States* (1978) 437 U.S. 1, 11 [57 L.Ed.2d 1, 9].) We express no opinion on whether double jeopardy principles would bar retrial for Padao's death under a different theory.[8] (See, e.g., *People v. Smith* (1998) 62 Cal.App.4th 1233, 1235-1236, fn. 1.)

III

*Evidentiary Issues*

A.  *Lieutenant Campbell's lay opinions*

Before trial, defense counsel moved to exclude Lieutenant Campbell's lay opinions that the crime scene photographs showed injuries to defendant's face and hand and suggested there had been a struggle inside Padao's car. The trial court ruled that the prosecution could present those opinions for the limited purpose of explaining the steps the lieutenant took in his investigation and pledged to give the jury a "contemporaneous instruction as to the limited purpose" of that testimony under Evidence Code section 355. Thereafter, when Campbell testified to those opinions, the trial court failed to admonish the jury that it could consider the opinions only for the limited purpose of explaining the steps in his investigation.

On appeal, defendant does not dispute the admission of the crime scene photographs, but he contends the trial court prejudicially erred by admitting Campbell's lay opinion testimony concerning what the photographs depicted. Defendant argues that by admitting the evidence without a limiting instruction, the court allowed the jury to consider the evidence for an improper purpose—to prove there was a struggle and that defendant sustained injuries to his face and hands.

The Attorney General argues that defendant forfeited this claim by failing to object when the evidence was presented. We agree.

---

[8]     Unless and until the prosecution chooses to retry the murder charge, the double-jeopardy issue is not yet ripe. (*People v. Zermeno* (1999) 21 Cal.4th 927, 933-934, fn. 3.)

The purpose of the forfeiture doctrine is to "reduce the number of errors committed in the first instance and preserve the judicial resources otherwise used to correct them." (*People v. Scott* (1994) 9 Cal.4th 331, 353.) The alleged error at issue here—an inadvertent failure to provide a limiting instruction that the court previously had agreed to give—is precisely the type of error that could have been easily corrected if called to the court's attention at some point prior to the jury's deliberations. (*People v. Dennis* (1998) 17 Cal.4th 468, 534 [court is not obligated to give limiting instructions when the evidence is presented].) Defendant's pretrial motion to exclude the opinion evidence did not excuse his failure to object when the offending evidence was presented at trial, especially where, as here, defense counsel elicited some of the same testimony on cross-examination. (*People v. Cowan* (2010) 50 Cal.4th 401, 479-480 (*Cowan*); *People v. Maciel* (2013) 57 Cal.4th 482, 528-529; *People v. Boone* (1954) 126 Cal.App.2d 746, 749.)

Anticipating the forfeiture problem, defendant argues that the trial court had a sua sponte duty to give a limiting instruction. We are unpersuaded. "Absent a request, a trial court generally has no duty to instruct as to the limited purpose for which evidence has been admitted. [Citations.]" (*Cowan, supra*, 50 Cal.4th at p. 479.) There is a "narrow exception to this rule in the ' "occasional extraordinary case" ' in which the evidence at issue ' "is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose." ' " (*Ibid*.) That exception does not apply here. Campbell's opinion testimony was not a dominant part of the prosecution's case. The testimony was admissible because it was rationally based on his perception of the crime scene photographs and helped explained the actions the lieutenant took in investigating the crime. And, as discussed *infra*, admission of the evidence was not highly prejudicial. The trial court therefore had no sua sponte duty to instruct.

Defendant alternatively argues that his attorney rendered ineffective assistance of counsel by failing to object to the lack of a limiting instruction. To establish ineffective

assistance, a defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and that the deficient performance was prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 693-694 [80 L.Ed.2d 674, 693-694, 697-698] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218 (*Ledesma*).) When a defendant has failed to establish prejudice, a reviewing court may reject the claim on that basis without determining whether counsel's performance was deficient. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1123.)

To establish prejudice, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." (*Strickland, supra*, 466 U.S. at p. 693; *Ledesma, supra*, 43 Cal.3d at p. 217.) The defendant must show there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. (*Strickland*, at p. 694; *Ledesma*, at pp. 217-218.) A reasonable probability is a probability sufficient to undermine confidence in the outcome. (*Strickland*, at p. 694; *Ledesma*, at p. 218.)

Defendant cannot meet this burden. Even if the failure to give a limiting instruction was error, it was not prejudicial. It is unlikely the jury assigned much weight to Lieutenant Campbell's opinion. Given the nature and context of Campbell's testimony, the jurors likely understood the limited use of his opinions about what the photographs revealed. The jury knew that Campbell was not a percipient witness and that the district attorney's office had asked him to investigate the case after the fact. The prosecution's questions were framed in terms of what he learned through the course of his investigation,[9] and when asked about the crime scene photographs, he couched his testimony as opinion, not fact.

---

[9]     The following exchange is instructive: "[Prosecution:] Because you looked at this photograph and saw what appeared to be scratches, is that why you requested that the

37

Further, the jury viewed the same photographs, and heard evidence conflicting with Lieutenant Campbell's opinions, including defendant's statement that he did not have any scratches, as well as the testimony of the officers at the scene who did not report seeing any scratches or signs of a struggle (but who conceded the photographs appeared to show injuries). The court properly instructed the jury that they were not required to accept any witness's opinion as true and correct, and that they may disregard all or any part of an opinion that they find unbelievable, unreasonable, or unsupported by the evidence. (CALCRIM Nos. 332, 333.) The court also instructed the jury that they "must decide what the facts are," and what evidence to believe. (CALCRIM Nos. 200, 220, 222, 302.) We presume the jury understood and followed the court's instructions. (*People v. Holt* (1997) 15 Cal.4th 619, 662.) Thus, under all the circumstances, it is unlikely the jury was influenced by Campbell's opinions, as opposed to its own evaluation of the evidence.

Finally, defense counsel specifically told the jury during closing argument that Campbell's opinions were merely to explain the steps he took in his investigation. Defense counsel also argued, at length, why the photographs did not support the prosecution's theory of a struggle.

On this record, it is not reasonably probable that defendant would have received a more favorable result if the trial court had specifically admonished the jury regarding Campbell's opinion testimony. Thus, defendant's ineffective assistance claim fails.

B.     *Padao's hearsay statements*

Defendant also argues that the judgment must be reversed because some of Padao's hearsay statements were admitted without an admonishment that they were admissible only as evidence of Padao's state of mind.

---

fingernail scrapings collected from [Padao] during the course of her autopsy be examined for possible DNA evidence? [¶] [Lt. Campbell:] Yes."

Before trial, the prosecution moved to admit certain statements made by Padao to friends and family regarding defendant's acts of domestic violence and her fearful state of mind. Defense counsel opposed admission of the statements, arguing that Padao's past state of mind was not at issue and that the statements were being offered for an improper purpose—to prove defendant acted in conformity with past conduct. The trial court granted the prosecution's motion, concluding the evidence was admissible for the purpose of explaining Padao's mental state at the time of the incident. The court stated that it would instruct the jury on the limited purpose of the evidence.

Defendant contends that despite having "pledged" to instruct the jury that the statements were admissible only as evidence of Padao's state of mind, the court broke that pledge, admonishing the jury in some instances, but not others. As a result, defendant contends the jury was allowed to consider some of Padao's statements for an impermissible hearsay purpose.

Again, the Attorney General argues that defendant forfeited this claim by failing to object when the evidence was presented. Again, we agree. Because defendant failed to request a limiting instruction when the evidence was presented, or to remind the court of the need for one at any point prior to jury deliberations, the claim is forfeited. (*Cowan, supra*, 50 Cal.4th at pp. 479-480; *People v. Maciel, supra*, 57 Cal.4th at pp. 528-529.) The court had no sua sponte duty to give a limiting instruction for such evidence. (*People v. Farnam* (2002) 28 Cal.4th 107, 163-164; *People v. Riccardi* (2012) 54 Cal.4th 758, 824-825 (*Riccardi*), overruled on other grounds as stated in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

We likewise reject defendant's alternative claim of ineffective assistance of counsel because, regardless of any tactical reasons for counsel's actions, defendant has not shown a reasonable probability that he would have received a more favorable result had additional limiting instructions been given. (*Strickland, supra*, 466 U.S. at p. 694.)

39

As a preliminary matter, we observe that not all of Padao's statements required a limiting instruction. Her statements involved two different theories of admissibility: statements that were admissible as hearsay under the state of mind exception to the hearsay rule (Evid. Code, § 1250), and statements that were admissible for the nonhearsay purpose of providing circumstantial evidence of her state of mind. (*People v. Ortiz* (1995) 38 Cal.App.4th 377, 389-390 (*Ortiz*); *Riccardi, supra*, 54 Cal.4th at pp. 822-823, overruled on other grounds as stated in *People v. Rangel, supra*, 62 Cal.4th at p. 1216.)

In the first category were Padao's direct declarations of her state of mind, such as statements that she was "afraid" of defendant. Although these statements were hearsay, they were admissible under Evidence Code section 1250 to prove her fear of defendant and explain her behavior on the day of the incident. (*Ortiz, supra*, 38 Cal.App.4th at pp. 389-390; *Riccardi, supra*, 54 Cal.4th at pp. 822-823; see also *People v. Kovacich* (2011) 201 Cal.App.4th 863, 884-890.) In the second category were statements that described defendant's violent character or conduct, from which the trier of fact was asked to draw an inference as to Padao's then-existing state of mind. Only this second category of statements—the circumstantial evidence of Padao's state of mind—required a limiting instruction. (*Ortiz*, at p. 389.)

Defendant argues that allowing the jury to consider the circumstantial evidence of Padao's state of mind without a limiting instruction was prejudicial because it "cast [him] as a serial abuser," and "greatly enhanced the likelihood that the jury would accept [that he] repeatedly abused Padao . . . in the past." However, such evidence could not have prejudiced defendant because there was overwhelming evidence of defendant's domestic abuse from other (admissible) sources. (*People v. Hensley* (2014) 59 Cal.4th 788, 811 [no prejudice where other evidence independently established facts].) That evidence included the direct testimony of Kelly, Anee, and Chane, who described numerous acts of domestic violence by defendant against them. The evidence also included (1) Padao's

expressions of fear; (2) other witnesses' perceptions of her fear and observations of her injuries; and (3) Padao's statements at the November 20 cultural meeting, which defendant concedes were admissible as adoptive admissions. Further, defense counsel conceded in his opening and closing arguments that "[defendant's] relationship with Padao was punctuated by acts of domestic violence." Indeed, defense counsel elicited similar reports of abuse during cross-examination.

On this record, we do not see any reasonable probability that defendant would have achieved a more favorable outcome but for the asserted error. Accordingly, defendant's ineffective assistance claim fails.

## IV

### *Cumulative Prejudice*

Even if no single error required reversal, defendant argues that the cumulative effect of the asserted errors denied him a fair trial and due process of law. We are satisfied that defendant received due process and a fair trial, so his claim of cumulative error fails.

## DISPOSITION

We reverse the conviction for first degree felony murder, vacate the special-circumstance finding, and remand the case to the trial court so that the People may elect whether to seek to retry defendant for Padao's death on an alternate theory. If the People

41

do not elect to retry the murder count, defendant shall be resentenced accordingly.  In all other respects, the judgment is affirmed.


                                                        KRAUSE        , J.


We concur:


        DUARTE        , Acting P. J.


        RENNER        , J.